# SUPPLEMENT.

### THE CONTRACTORS TO REBUILD AND SUPPORT UNION WHARF AND PIER IN NEW HAVEN *vs.* THE STEAMER J. H. STARIN.

The libellants were the owners of an ancient pier extending several hundred feet into New Haven harbor, which had been constructed and maintained under sundry resolves of the legislature, which authorized the collection of certain wharfage upon goods discharged upon or shipped from it, and made such wharfage a lien upon the vessels. The proprietors of the undivided lands of the town had granted the land necessary for the pier, and as an inducement to the undertaking had voted that no other wharf should be established upon the east side of it within three rods. Afterwards the libellants agreed with a canal company that the latter might run an embankment and wharf from a point on the east side of their pier to the mainland, enclosing a large basin for the boats of the canal, which, with the goods transported by them, were to be exempt from wharfage for that part of the pier taken into the basin, the libellants retaining every other right before possessed. The canal was afterwards abandoned and the basin filled up, the rights of the canal company as to the basin and pier becoming vested, with the libellants' consent, in a railroad company; the libellants neither then nor afterwards relinquishing, either expressly or by non-user, any further rights of wharfage. Afterwards, another railroad company acquired from the company before mentioned the right to construct, and constructed, a pier extending into the harbor from the basin wharf, parallel with and about four hundred feet from the libellants' pier. At this pier a coasting vessel discharged and received goods, which were transported to and from the mainland over the basin wharf and that part of the libellants' pier which had adjoined the canal basin and which was now a part of the mainland. Held, in a libel of the vessel for wharfage upon the goods—

1. That while that part of the pier had become a public highway for all other purposes, it was still a part of the libellants' pier as to all freight transported over it to and from vessels.

2. That the protection of the libellants by the vote of the proprietors of undivided lands, from any other wharf within three rods, did not operate to limit their rights to the case of freight discharged from or delivered to vessels within that distance.

3. That the goods in question were therefore liable to pay wharfage.

4. That as the law gave a lien upon the vessel for the wharfage, it was a proper case for the libel of the vessel in a court of admiralty.

The construction given by the Supreme Court of Connecticut in *Union Wharf Co.* v. *Hemingway*, 12 Conn., 293, to the resolves of the legislature of Connecticut under which the libellants claim, must be accepted as the proper construction of those resolves.

LIBEL of a vessel; in the United States Circuit Court for the District of Connecticut, September term, 1878. The case is fully stated in the opinion.

Contractors for Union Wharf *v.* Steamer **J. H. Starin.**

*S. E. Baldwin,* for the libellant.

*G. H. Watrous, W. B. Wooster,* and *M. F. Tyler,* for the defendants.

BLATCHFORD, J. The facts of this case are largely set forth in the judgment rendered by the District Court. The question is one of law, as to what rights were conferred on the libellants by the statute law of the state of Connecticut, in respect to wharfage, so called, on goods in the situation of those involved in the present case. The decision of the highest court of the state of Connecticut on the very question must be accepted as the proper interpretation of such statute law. In 1837 the case of *Union Wharf Co.* v. *Hemingway,* 12 Conn., 293, an action of assumpsit for the wharfage of goods, brought by the same corporation which is the libellant in this case, was decided by the Supreme Court of Errors of Connecticut. The defendants in that case owned vessels which ran from New Haven to New York and back, and also owned stores or warehouses on the west side of the plaintiff's wharf. These vessels discharged their cargoes at the basin wharf, on the outer side thereof, at a point more than three rods distant from the plaintiffs' wharf; and the goods thus landed upon the basin wharf were transported across the plaintiffs' wharf to the defendants' stores or were transported upon the plaintiffs' wharf to the mainland. Then, as now, the basin wharf abutted on the libellants' wharf, on the east side of the libellants' wharf. Then, as now, the libellants' wharf and the basin wharf were each of them used as a free public highway to pass and repass upon. The proprietors of the libellants' wharf demanded and received wharfage from all parties using it, continuously, from the year 1746. In 1760, the colonial legislature granted to the proprietors of the libellant's wharf a charter, incorporating them as "The Union Wharf Company in New Haven," and recognized their ownership of such wharf, and gave them power to repair and manage the wharf for the future, and to keep accounts, and to take care of the wharfage of the wharf, through a com-

mi , which committee should account for the receipts of the company, and to agree with any member to keep the wharf in repair and take the profits till they should satisfy his disbursements. In October, 1801, the legislature of Connecticut (1 *Private Laws of Connecticut*, p. 523,) incorporated the owners and proprietors of the libellant's wharf by the name of "The Union Wharf Company in New Haven." The resolve of incorporation authorized the company "at all times hereafter, to make all necessary contracts for the rebuilding, repairing or extending said wharf and pier in such manner as they shall direct and for keeping the same in repair," and to assign to the contractor the income of the wharf, and the right to collect the wharfage established by the company from time to time until the income should reimburse the expenditure, with interest, after which the income should revert to the company, subject to such reasonable restrictions or extension with respect to repairs and wharfage as the legislature might then think proper to adopt. In May, 1810, the legislature of Connecticut, (1 *Private Laws of Connecticut*, p. 497,) incorporated the libellant by the name of "The Contractors to rebuild and support Union Wharf and Pier in New Haven," and gave the corporation power to make such ordinances as it might find necessary, to regulate the mode of receiving, collecting and enforcing the payment of wharfage. The corporators were authorized to appoint five directors to manage the concerns of the company. The resolve proceeds: "And the directors so chosen may appoint from time to time a suitable person as a wharfinger, who shall have power to collect and receive the wharfage when due, and, upon neglect or refusal to pay the same after notice and demand, it shall be lawful for such wharfinger either to sue at common law, or to distrain for such wharfage, on any goods or chattels found on board the ship or vessel from which the same shall have accrued, and the goods or chattels so distrained to sell and dispose of in the same manner as if taken on execution, and the wharfage due for or on account of any ship or vessel, or the cargo thereof, shall be and remain a lien on such ship or vessel until the same shall be

discharged." Prior to the resolve of 1810 the Wharf Company had contracted with the parties who became so incorporated in 1810 as the libellant, for the rebuilding, extension and maintenance by the latter of such wharf and pier. Soon after the libellant was so incorporated it rebuilt and extended the wharf and pier, according to such contract, and received from the Wharf Company an assignment of the income thereafter to accrue from said wharf and pier, and the right to collect all the wharfage thereafter to accrue by reason of the use of the same, in any manner, by any parties, from time to time. Afterwards, in October, 1815, the legislature of Connecticut passed a resolve declaring that the libellant "has the right of collecting wharfage to reimburse it for its expenses according to its contract with the Union Wharf Company, at a rate not exceeding a tariff annexed to said resolve," and thereby establishing said tariff accordingly, and further declaring "that neither the claims of any individual or individuals to be exempted from wharfage, nor the claims of said company to demand wharfage of such individual or individuals, shall be in any way affected by this resolve." This tariff fixes as wharfage so much per ton per year, for vessels belonging to New Haven employed in foreign trade, and so much per ton per year for coasting vessels belonging to New Haven, the above to be payable semi-annually, July 1st and January 1st; and so much per ton per day for coasting vessels not belonging to New Haven, and so much per ton per day for sea vessels not belonging to New Haven, with the privilege to vessels not belonging to New Haven to enter at any time for one year by paying in advance the same wharfage as vessels belonging to New Haven. "All goods landed from or put on board coasting vessels" were required "to pay the following rates of wharfage," different articles of merchandise being specified, and the rate of wharfage being fixed at so much each, or so much per ton, or bale or cubic foot, or bag, or thousand, or box, or fifty feet, or hundred weight, or dozen bottles, or dozen or cask, or hogshead, &c. The resolve proceeds: "All other articles not enumerated in same proportion. Goods or mer-

chandise taken by water from, or by water put on board, coasting vessels lying at, or attached to vessels made fast to the wharf, to pay half wharfage, unless the said goods or merchandise be conveyed to or from the wharf or any store adjoining the same, in which case full wharfage shall be charged. All vessels belonging to this port, which either lie at the wharf, or use it by taking on board or landing any part of their cargo or passengers, shall pay six months' wharfage on the vessel, which vessel shall be entitled to the use of the wharf, if after January, until the next following July; if after July, until the next following January. Vessels coming into this port, which enter by the year, shall pay wharfage at the rates above established, from the time they arrive till the next following January or July. Vessels, owners, masters, and goods are liable for wharfage. * * * All articles landed on the wharf, and remaining more than four days, shall pay in addition for each day after, one-fourth of the established rates of wharfage. All articles brought by land and left on the wharf shall, after the expiration of four days, be liable to the same rate of wharfage as if imported by water, and, if left in such a situation as will incommode the free use of the wharf, and the owner or person having charge thereof shall neglect to remove the same on notice from the wharfinger, the same shall be deemed a nuisance, and may be removed by the wharfinger at the expense of the owner. Ballast deposited on the wharf shall be liable to wharfage, if suffered to remain more than four days without special license from the wharfinger, and, if left on the wharf after the vessel which discharged it shall have departed from the port, shall be forfeited to the use of the company; provided, however, that this resolve shall at all times be liable to be altered or repealed by the General Assembly." The resolve also provided that sea vessels not belonging to New Haven should be liable to " the same wharfage for goods landed or taken off as coasting vessels." The following resolve was passed in May, 1819 (1 *Private Laws of Connecticut*, p. 502): " Upon petition of the contractors praying for an alteration in their tariff of wharfage and proviso contained

in their former grant—Resolved by this Assembly, that in lieu of said proviso, and the exemptions heretofore claimed, the following alterations of and additions to the rates of wharfage heretofore established be made and become permanent, and not subject to be altered, without the sanction of this Assembly, viz.: 1st. That lumber landed by water, in any of the yards adjoining the wharf, shall pay only one-half the rate of wharfage heretofore established, provided the lumber is owned by the proprietors or occupants of the yard. 2d. Goods or merchandise, other than lumber, landed from a coasting vessel, into any of the back doors of the stores or back yards, if to be exported in a sea vessel, without coming on to the wharf in front of said stores or yards, and all articles landed in the same manner from any vessel employed in foreign trade, and exported coastwise, without coming on to the wharf in front, shall pay only one-half the rates of wharfage heretofore established. 3d. All articles landed from a coasting vessel into any of the stores or yards aforesaid, if to be exported coastwise, and not coming on to the wharf in front, shall pay half the established rate of wharfage when landed, and half when taken off. 4th. No goods or merchandise landed into, or shipped from, any of the back doors of stores, or yards adjoining the wharf, shall be exempted from the payment of wharfage on both landing and shipping, unless owned by the owners or occupiers of said stores or yards. 5th. All articles landed on any part of the wharf, from a coasting vessel, if re-shipped within two days, coastwise, shall pay only one wharfage, provided the said articles have not been carted up or down the wharf, and have not been sold. 6th. Goods shipped and immediately re-landed shall pay only one wharfage. And the petitioners shall have the same power and authority to collect the wharfage hereby established, and to enforce the collection thereof in the same manner, as is provided for the collection of the wharfage heretofore established, any law or provision in said former resolve to the contrary notwithstanding." In 1826 the Union Wharf Company and the libellant entered into an agreement with the Farmington Canal Company, a Connec-

ticut corporation, whereby the canal company was authorized to construct a canal basin on the east side of the libellant's wharf, and to enclose the seaward side thereof by an embankment or wharf running from the mainland near the foot of Brewery street to the east side of the libellant's wharf, and whereby the canal company was to forever keep in repair the part of the east side of the libellant's wharf, which would be thus included in such basin, and the canal boats and their lading, which should be transported up and down the canal within such basin, were to be free from wharfage from the libellant's wharf; and by which it was provided that all powers and rights not therein especially granted should be retained by the libellant. The canal company obtained due authority and constructed the basin and the embankment, such embankment being what is before referred to as the basin wharf.

Such was the condition of things when the case of *Union Wharf Company* v. *Hemingway* was decided.

[The opinion here quotes at much length the statement of facts in the report of the case referred to, 12 Conn. R., 293, with the points made by the counsel for the defendants, and gives a great part of the opinion of WILLIAMS, C. J., in which the other judges concurred, except CHURCH, J., who dissented. The opinion then proceeds as follows:—] ·

It is entirely clear that the state court, in construing the legislative grants to the Union Wharf Company, and to the libellant, and the contract with the canal company, asserted the truth of the following propositions: (1) That goods arriving by water by a coasting vessel, and transported over the libellant's wharf, to reach their place of destination on the mainland, are liable to pay wharfage to the proprietors of such wharf, if they are discharged from such vessel upon the canal wharf or basin wharf, even at a point distant more than three rods easterly from the libellant's wharf, and then pass upon carts over the basin wharf on to the libellant's wharf, and upon the latter wharf to points in the city beyond it; (2) That, under such circumstances, such goods may be fairly said to be landed on the libellant's wharf; (3) That

the term "wharfage" includes the compensation for such use of the libellant's wharf; (4) That the proprietors of the libellant's wharf, before the construction of the basin wharf, had the right to demand wharfage as compensation for the use of their wharf in transporting over it goods arriving by water in a coasting vessel, though first discharged from such vessel on a wharf four rods distant from the libellant's wharf, if they were afterwards transported over the libellant's wharf to reach their destination on the mainland beyond the libellant's wharf, and that the right to such wharfage was not abridged by anything in the agreement with the canal company, or by anything done thereunder in the construction of the basin or of the basin wharf; and (5) That the owner of the goods liable to such wharfage has no rights as against the claim of the proprietors of the libellant's wharf to such wharfage on such goods which the canal company did not have.

Aside from the binding character of these adjudications of the highest state court on the questions in issue, reference may be made, in support of the correctness of the conclusions arrived at, to provisions before cited, from the resolves of the legislature, to show that the scheme of the legislature was to permit the proprietors of the libellant's wharf to receive wharfage in some cases for the use of the wharf, in respect of goods, even when there was no landing on the wharf, or deposit on or transit over the wharf, of goods which had arrived by water. Thus, by the resolve of 1815, goods taken by water from, or by water put on board of, coasting vessels lying at the wharf, or attached to vessels made fast to the wharf, were required to pay half wharfage, even though the goods were not conveyed to or from the wharf or any store adjoining the wharf. By the same resolve, all articles brought by land and left on the wharf, even though not imported by water, were required, after the expiration of four days, to pay the same rate of wharfage as if imported by water. In another direction, compensation was given directly for the use by goods of the wharf in front of a store or yard, irrespective of the landing of the goods in

the store or yard, and for the use of the wharf to cart goods up and down the wharf which had been landed on the wharf. Thus, by the resolve of 1819, goods other than lumber landed from a coasting vessel into any of the back doors of the stores or back yards, if to be exported in a sea vessel without coming on to the wharf in front of said stores or yards, and all articles landed in the same manner from any vessel employed in foreign trade, and exported coastwise, without coming on to the wharf in front, were made subject to only one-half of the established rates of wharfage, and all articles landed from a coasting vessel into any of said stores or yards, if to be exported coastwise, and not coming on to the wharf in front, were required to pay only one-half of the landing wharfage, when landed, and one-half of the wharfage for putting on board, when taken off. By the same resolve all articles landed on any part of the wharf from a coasting vessel, if re-shipped within two days coastwise, were required to pay but one wharfage; that is, not wharfage for landing and wharfage for putting on board, but only one of the two, in case such articles had not been carted up or down the wharf, and had not been sold.

The present suit is a libel *in rem* against the steamer J. H. Starin, a packet-boat plying daily between New Haven and New York. On each one of six days in January, February, and March, 1877, she lay for a time in the port of New Haven, at a wharf called the Derby Railroad Wharf, which was within four hundred and sixteen feet of the libellant's wharf, and east of it, receiving and discharging freight and passengers. The Derby Railroad Wharf is a wharf abutting on the basin wharf and running outwardly from it in a south-easterly direction, and about in a line parallel with the libellant's wharf. On the days before named the steamer discharged and received on board a large quantity of goods, as freight, a great part of which were carted upon and over the libellant's wharf, and that part of the basin wharf which lies between the Derby Railroad wharf and the libellant's wharf. If the goods so carted upon and down the libellant's wharf and thence over the basin wharf, and the Derby Railroad

wharf to the steamer, and those so unladen from the steamer and carted over the basin wharf to, upon, and up the libellant's wharf, had been originally laden upon, or unladen from, the steamer, while lying immediately alongside of the libellant's wharf, the wharfage on the same, which the libellant would have been entitled to charge and collect, would have been $76.10.

The canal company, before mentioned, in 1836, after it had constructed the basin and the basin wharf, ceased to do business, and prior to January 1st, 1848, it conveyed to the New Haven & Northampton Company all the rights which it had to the canal basin.

In 1845, the legislature of Connecticut, by a resolve, (*Private Laws of Connecticut*, Vol. 4, p. 1380,) gave to the New Haven & Northampton Company the right of collecting wharfage " at their basin wharf," between the libellant's wharf and Tomlinson's wharf, at a rate not exceeding a tariff thereunto annexed, and established said tariff, with the proviso " that neither the claims of any individual or individuals to be exempted from wharfage, nor the claims of said company to demand wharfage of such individual or individuals, shall be in any way affected by this resolve." At the same session of the General Assembly a resolve was passed in these words : " Whereas, a resolution has passed this Assembly at its present session relating to the rate of wharfage on the basin wharf in the city of New Haven :—Resolved by this Assembly, that nothing therein contained shall be construed to affect the rights of the Union Wharf Company, or the Contractors to rebuild and support Union Wharf and Pier in New Haven, to collect wharfage in any case whatever, or any other existing rights of said company." The New Haven & Northampton Company, on the 24th of March, 1848, conveyed to the New York & New Haven Railroad Company all its rights to a part of the canal basin, comprising that part of it opposite to which the Derby Railroad wharf is built, the basin being then disused. On the 7th of September, 1848, the libellant and the Union Wharf Company conveyed to the New York & New Haven Railroad Company,

the right to cross the libellant's wharf with its railroad, and to fill up a certain part of the flats adjoining the east side of said wharf, within the limits of the canal basin, down to a point seven hundred and thirty-one feet southerly from the libellant's well at the head of said wharf. But the grants and consent were made upon the express conditions, that the grantors reserved the right to collect on all goods landed by water, or taken off by water, on and from the wharves, or embankments, piers or bridges belonging to or constructed or occupied by the railroad company, and connected with the libellant's wharf on either side thereof, the same rate of wharfage as was then collected and received by said grantors on goods landed or taken off by water on and from the wharves attached to and connected with the libellant's wharf on the west side thereof, except on goods carried up or brought down in the cars of the railroad company without otherwise coming on to the libellant's wharf, and except on goods to be used for railroad purposes on said railroad; and on the express further conditions, that no buildings should be erected or placed on the east side of the libellant's wharf within eighty feet of the front line of stores then standing on the libellant's wharf, and that any railroad tracks which might be thereafter placed on the east side of the libellant's wharf, running northerly, should be placed between said wharf and any buildings which might be erected or placed on the east side thereof on said adjoining wharves.

The grantee, in the same deed, agreed that the grantors should have the said power of collecting so reserved by them, and that the grantee would observe all the conditions so expressed as those on which said grants and consent were given and made according to the true intent and meaning of the same.

On the 19th day of July, 1852, the libellant and the Union Wharf Company conveyed to the New York & New Haven Railroad Company permission to fill up its railroad embankment on the east side of the libellant's wharf, to extend southerly to the south side of the basin wharf, from the said point distant seven hundred and thirty-one feet southerly

from the said well, and to adjoin said embankment to the east side of the libellant's wharf, along the whole length thereof, from the termination of said former grant to the south side of the basin wharf, on the express conditions and reservations that the grantors should have the right to collect the same rates of wharfage on the embankments or wharf which might be built within those limits, and also on and from that part of the basin wharf which extends for a distance of four hundred and sixteen feet of its length from its junction with the libellant's wharf, and also on all wharves which might be constructed or attached to the basin wharf, within such distance of four hundred and sixteen feet, as was then collected by the grantors on the libellant's wharf, except on goods carried up or brought down in the cars of the railroad company without otherwise coming on the libellant's wharf, and except also on goods to be used for railroad purposes on said railroad, with express further conditions as to the erection of buildings to the eastward of the libellant's wharf, and as to constructing a drain, and as to the location of wood-yards and coal-yards, and as to some other minor matters. The grantee agreed that the grantors should enjoy the right of collecting wharfage in the manner and on the wharves before reserved and specified, and that the grantee would observe all the conditions so expressed as those on which such grant and permission was given and made, according to the true intent and meaning of the same.

Under the said grants to the New York & New Haven Railroad Company, the part of the canal basin contiguous to the east side of the libellant's wharf was, prior to the 1st of January, 1874, filled up solid by said company down to the line of the basin wharf, thus barring all immediate access by water to the easterly side of the libellant's wharf, north of the basin wharf. Prior to 1874 all rights, franchises, property, and obligations of the New York & New Haven Railroad Company became legally vested in the New York, New Haven & Hartford Railroad Company. The latter company, on the 9th of October, 1873, by a lease in perpetuity made by it to the New Haven & Derby Railroad Company, gave to

that company certain rights under which the Derby Railroad wharf, before mentioned, was constructed in 1874.

The evidence shows that ever since the decision in the Hemingway suit, the proprietors of the libellant's wharf have claimed to collect, and have collected, wharfage for the use of such wharf to transport thereon goods coming on to it from the basin wharf and goods going from it on to the basin wharf, which arrived by water in coasting-vessels or were shipped by water in coasting-vessels, and were discharged upon the basin wharf or laden from the basin wharf, except so far as the right to collect such wharfage was expressly parted with by the instrument before recited. It also appears that the libellant exclusively keeps in repair the part of its wharf which lies northerly of its junction with the basin wharf.

The affirmative defence set up in the answer is, that the basin wharf is a part of the mainland and a public highway; that the part of the libellant's wharf which is north of its junction with the basin wharf is a part of the mainland and a public highway; and that the wharf at which the steamer discharged and received said goods is more than three rods distant, to the eastward, from the libellant's wharf.

The question does not seem to be varied at all from what it was when the Hemingway case was decided, so far as regards goods in the situation of those involved in the present case, except so far as it may be varied by the fact that since then the canal basin has been filled up, so that what was then water has become land, continuous with the mainland inside, and continuous with the basin wharf on the outside. But the basin wharf was built and connected with the libellant's wharf by the permission of the libellant, and the libellant necessarily reserved all rights to wharfage which it did not expressly then part with. By the decision of the state court it had the right which is claimed in the present suit. That right was not parted with, in the grants to the canal company, or in the grants to the New York & New Haven Railroad Company, and the claimant can have

no better position as against the libellant in respect of such right than that company had or than the canal company had.    The *locus in quo* of the discharge and shipment of the goods in this case is to the westward of a line crossing the basin wharf at a distance of four hundred and sixteen feet east from the libellant's wharf.    The libellant does not make in the present case a claim, by virtue of any of the instruments before recited, to any greater right than has been conferred upon it by statute, but only claims that while the right insisted on in this case was granted to it by statute, it has not parted with such right by any of such instruments.

The fact that the basin wharf is connected with the mainland by the filling in of the canal basin, or by the route thorough Brewery street, cannot vary the libellant's rights in the present case.    The wharfage here claimed is for the use of the libellant's wharf by transporting the goods over it.    If they had not been transported over it, but had been taken to or from the Derby Railroad wharf by the way of Brewery street, they would not have been subject to wharfage for being transported over the libellant's wharf.

On the evidence, the libellant's wharf must still be regarded as a wharf, in the part of it used by the goods in this case, so that the statutory rights given in respect to it remain, *quoad* such goods and their use of it, however much it may be a public highway in respect to goods not liable to wharfage for the use of it.    If the libellant is usurping a franchise which does not belong to it, its title to such franchise can undoubtedly be tried by a proper judicial proceeding in the tribunals of the state.    But so long· as the libellant's wharf is used for the transportation over it of goods coming from the basin wharf on to it, or of goods going from it on to the basin wharf, which goods have been discharged from, or are afterwards laden on, a coasting vessel, at the point on the basin wharf where the goods in this case were discharged and laden, and so long as the decision in the Hemingway case stands as the interpretation by the highest state court of the resolves of the legislature, so long must this court maintain the claim made by the libellant in this case.

By the resolve of 1810, it is provided that upon neglect or refusal to pay wharfage after notice and demand, it shall be lawful either to sue for the same at common law, or to distrain therefor to the extent specified; and that the wharfage due for or on account of any vessel or the cargo thereof shall be and remain a lien on such vessel until the same shall be discharged. It is clear that the resolve means that wharfage on cargo is to be a lien on the vessel until such wharfage is paid. It is left to the vessel to see that it is made secure for its liability, which it can well do, having possession of the goods, and being able to take care either that they do not pass over the libellant's wharf, or, if they do, that the proper wharfage therefor is paid.

The claim to a lien for wharfage in this case is such a claim as is cognizable in admiralty. The use of the libellant's wharf facilitated the operation of the steamer in loading and discharging, to such an extent that the legislature thought fit to give a lien on the steamer for the wharfage dues prescribed for the cargo. The use of the libellant's wharf, as it was used in this case, pertained to navigation by water, to such an extent that the implied contract for wharfage, in respect of the goods, may properly be regarded as a maritime contract, of benefit to the steamer, and therefore one the lien given for which by the resolve is cognizable and enforceable in the admiralty. *The Lottawanna,* 21 Wallace, 558; *Ex parte Easton,* 5 Otto, 68; *The Virginia Rulon,* 13 Blatchf. C. C. R., 519. There was a sufficient notice and demand in this case prior to the bringing of the suit.

The libellant is entitled to a decree for $76.10, with interest thereon from July 1st, 1878, and for $80.73, its costs in the District Court, and for its costs in this court.

I do not understand the libel in this case as making any claim for wharfage founded on anything except the use of the libellant's wharf by the goods. It does not claim, in addition, that the steamer is liable for any wharfage prescribed for vessels, aside from the liability of the steamer for the wharfage prescribed for the goods. I therefore express no opinion on that question, nor on any question except the one distinctly involved in this case.